## LEHIGH & HUDSON RIVER RY. CO. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Second Circuit. December 16, 1929.

No. 131.

R. Kemp Slaughter and Hugh C. Bickford, both of Washington, D. C., for petitioner.

J. Louis Monarch, Sp. Asst. to Atty. Gen., and P. S. Crewe, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., and John Vaughan Groner, Sp. Asst. Atty. Gen., of counsel), for respondent.

Before MANTON, L. HAND, and MACK, Circuit Judges.

L. HAND, Circuit Judge. The President seized the petitioner's railway under his war powers on December 28, 1917, and operated it by the Director General until its redelivery on March 1, 1920. When seized, materials and supplies to the value of $336,000 were taken with it, which the Director General used at need in its operation. When he redelivered it on March 1, 1920, he turned back supplies which had cost $223,000, of which it did not appear how many, if any, were the same as those originally taken, nor when, nor at what prices, he bought what he replaced. Upon his books in his account with the railway he allowed for the resulting shortage the sum of $234,800, because of the increase in the value of what he had consumed. The claim made by the railway for this shortage in the general accounting which followed was $248,000. Each account was in the form

of debit and credit, the railway being charged with certain items as to which there was not much variance, and credited with others, as to which there was. The railway's general balance was $512,700; that conceded by the Director General, $153,000.

After certain negotiations, during which the Director General suppressed his own figures, the parties came to a compromise by which $225,000 was paid and accepted in full settlement. The Director General thereupon restated the figures on his books, raising the item in question by $13,000, and setting off the rise by an equal charge for betterments, and absorbing the difference between the balance shown and that paid by reducing the charge pro tanto for over-maintenance. These amended figures the railway saw later and set up its own books in accordance with them.

In correcting the railway's return the Commissioner proceeded as follows: He subtracted from the amount of supplies on hand on January 1, 1918 ($336,000), the cost of those surrendered on March 1, 1920 ($223,000). This left a balance of $113,000, representing the cost of the dissipated supplies. He thereupon assumed that the allowance for these on the Director General's books ($234,800) represented their increased value on March 1, 1920, and treated the dissipation and payment as a completed conversion by requisition. He held that for his purposes this was the equivalent of a sale or other voluntary disposition of the goods, and that the difference was a gain or profit, and part of the income of the railway for the year in question. Thus he arrived at the sum of $121,800, with which he surcharged the return. This is the only item at issue, except one which may be ignored for the moment.

Assuming that it is proper to take the cost of the supplies turned over in kind ($223,000), as their quantitative measure, the result appears to us correct. In a shifting stock of consumable supplies it is, of course, true that the identical chattels will not be retained, but the originals and substitutes are fungibles, and the substitution can therefore be ignored. If the Director General seized 10,000 tons of coal and turned back five of the same quality, while none of that coal may have been the same, and probably was not, the railway cannot complain; it is like wheat in a bin. The quantity used and not restored he was obliged to pay for, not at its value when he used it, but when he returned the road, because his contract of March 28, 1919,

so required, and this was the promise which he performed by his payment of $234,800.

Such a transaction is equivalent for tax purposes to a sale of the supplies at the agreed price. The act of 1918 (40 Stat. 1057) did not, indeed, expressly provide for gains arising from the requisition of property, but article 49 of the Regulations did: "When the owner of property has lost or transferred title by reason of requisition or eminent domain * * * if the taxpayer does not elect to replace or restore the property, the transaction will then be deemed to be completed and the income shall be measured by the excess of the amount of the compensation over the cost of the property." This article and article 50 prescribed the formalities by which the election should be manifested, with none of which the railway conformed. Section 234(a)(14) of the act of 1921 (42 Stat. 257) treats such a gain as income, and in our judgment it is no more than declaratory of what was implicit before. It can scarcely be necessary to labor the argument that a man may make the same profit out of property which has been requisitioned, as he would out of its sale at the same price. Edwards v. Cuba R. R., 268 U. S. 628, 45 S. Ct. 614, 69 L. Ed. 1124, touched subsidies which were not given altogether for a consideration moving from the grantor; they were not, therefore, to be regarded as income paid in advance. Moreover, they were not payments for property taken.

We have assumed that the proof showed that the credit of $234,800 on the Director General's accounts was paid, and this involves the conclusion that it was comprehended in the settlement of $225,000. This the railway insistently disputes, arguing that as the compromise was made without allocation of any sort, and indeed in ignorance of the account as it stood on the Director General's books, it is impossible to say that it paid any particular item, either of its own claim or of the suppressed books. The parties were at any rate settling a claim presented by the railway and the ordinary rule is that the debtor, in this case the Director General, may allocate the payment at his will. Tayloe v. Sandiford, 7 Wheat. 13, 5 L. Ed. 384; U. S. v. Kirkpatrick, 9 Wheat. 720, 6 L. Ed. 199; Jones v. U. S., 7 How. 681, 12 L. Ed. 870; Delaware Dredging Co. v. Tucker Stevedoring Co., 25 F.(2d) 44 (C. C. A. 3). If he does not, the creditor may do so in his place. The payment made in the case at bar the debtor did not allocate to the railway's knowledge, though he did so upon his own

books, leaving untouched the item in question, since we may ignore the added credit and surcharge mentioned above. Assuming that this uncommunicated allocation would not have affected the rights of the parties, had the matter stood there, it did not. On the contrary, the railway, learning at a later time of the figures on the Director General's books, accepted them and set up its own books so as to correspond. Thus the parties were in agreement as to how the payment should be applied; the allocation was complete on any theory.

We need not, therefore, determine how we should ourselves have allocated it, in the absence of any action by either side, as we should have had to do. However, it is fair to add that it would in our judgment be absurd to hold that the item should not have been taken at as much at least as the Director General admitted to be due, the payment being more than the conceded general balance, and the railway having put the same item in its claim at a greater amount.

A question of fact alone remains. The Commissioner assumed in his calculation that the supplies turned over on March 1, 1920, which had cost $223,000, were equal in quantity to supplies on hand on January 1, 1918, which had cost the same amount. It was by subtracting this sum from the cost of the supplies on hand on January 1, 1918, that he found the cost of the supplies used and not replaced ($113,000), the figure which he subtracted from the allowance ($234,000). Obviously the assumption may or may not have been true; probably it was not, because the cost of such supplies was rising and he must have bought a large part of them during his operation of the road. Suppose for instance that all the supplies were coal whose cost was $4 a ton on January 1, 1918, and an average of $5 between then and March 1, 1920. If the Director General had burnt all the original coal, and the cost of what he turned over on March 1, 1920, was $223,000, that would have amounted to 44,600 tons, and the shortage was 39,400 tons, instead of 28,-250. In such case the petitioner's profit was $77,200, instead of $121,800.

The board dealt with this question under the burden of proof, correctly as we think. It was easy for the railway to prove the shortage in the supplies in kind, without leaving the matter to presumption. It was easy, also, to prove what part of the cost of $336,-000 this shortage represented. Having failed to make such proof, the board could do nothing but assume a dollar for dollar equivalency and fix its profit accordingly.

There is another item which we need not discuss, since it is conceded to fall within our ruling in American Code Co., Inc., v. Commissioner of Internal Revenue, 30 F.(2d) 222, and was not on that account argued. As this ruling is now on review by the Supreme Court, we will, however, stay our mandate until the writ is disposed of.

The order is modified, by deducting from the corrected return the sum of $10,614.12, and, as so modified, it is affirmed; mandate to be stayed until the decision of the Supreme Court (279 U. S. 832, 49 S. Ct. 481, 73 L. Ed. 982) upon the certiorari issued in American Code Co. v. Commissioner, 30 F.(2d) 222.